UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
MICHEL ANNE POCEOUS,

               Plaintiff,               MEMORANDUM & ORDER
                                             20-CV-4870 (JS)

    -against-

COMMISSIONER OF SOCIAL SECURITY,

               Defendant.
-------------------------------X
APPEARANCES
For Plaintiff:       Howard Olinsky Esq.
                  Olinsky Law Group
                  250 South Clinton Street, Suite 210
                  Syracuse, New York  13202

For Defendant:       John C. Fischer, Esq.
                  United States Attorney's Office
                  Eastern District of New York
                  c/o SSA Office of General Counsel
                  6401 Security Boulevard
                  Baltimore, Maryland  21235


SEYBERT, District Judge:

          Plaintiff Michel A. Poceous ("Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the denial of her application for Social Security Disability Insurance Benefits by the Commissioner of Social Security (the "Commissioner"). (Compl., ECF No. 1.)  Pending before the Court are the parties' cross-motions for judgment on the pleadings.  (Pl. Mot., ECF No. 12; Pl. Support Memo, ECF No. 12-1; Pl. Reply, ECF No. 16; Comm'r X-Mot., ECF No. 15, Comm'r Support Memo, ECF No. 15-1.)  For the

following reasons, Plaintiff's Motion is GRANTED, and the Commissioner's Cross-Motion is DENIED.

BACKGROUND[1]

I.   Procedural History

On November 9, 2016, Plaintiff filed an application for disability alleging a primary diagnosis due to Vascular Insult to the Brain and secondary diagnosis of heart disease and chronic ischemic "w/wo Angina". (R. 97.)   After Plaintiff's claim was denied, she requested a hearing before an Administrative Law Judge ("ALJ"). (R. 108.)   On January 17, 2019, accompanied by a representative, Plaintiff appeared for a hearing before ALJ Patrick Kilgannon. (R. 48-88.)   David Vandergoot, a vocational expert ("VE"), testified at the hearing (R. 73 –87), as did Justin Willer, a medical expert (R. 79-87).

In an August 20, 2019 decision, the ALJ found the Plaintiff was not disabled. (R. 23). Although Plaintiff requested a review of the ALJ's decision, that request was denied by the Appeals Council on August 11, 2020 (R. 1); thus, the ALJ decision became the Commissioner's final decision. (R. 1-5.)

---

[1]  The background is derived from the administrative record filed by the Commissioner on May 24, 2021. (See ECF No. 9.) For purposes of this Memorandum and Order, familiarity with the administrative record is presumed.  The Court's discussion of the evidence is limited to the challenges and responses raised in the parties' briefs.  Hereafter, the administrative record will be denoted "R." When citing to the administrative record, the Court will use the relevant Bates number(s) provided therein.

Thereafter, on October 9, 2020, Plaintiff commenced this action seeking appellate review of the ALJ decision. (See Compl., ECF No. 1, ¶¶ 1-2.)  Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, on October 21, 2021, Plaintiff moved for judgment on the pleadings. (See Motion, ECF No. 12.)  In response, on January 20, 2022, the Commissioner cross-moved for judgement on the pleadings. (See Cross-Motion, ECF No. 16.)  The Motions are ripe for decision.

II.  Evidence Presented to the ALJ

The Court first summarizes Plaintiff's employment history and testimonial evidence before turning to the medical record, consultative evidence, and the VE's testimony.

A.  Testimonial Evidence and Employment History

Plaintiff was born on April 2, 1957. (R. 89.)  She worked as an office typist for a state district court from July 30, 1992 to December 12, 2001. (R. 294.)  Plaintiff was then promoted to a Senior Court Clerk for the Supreme Court of New York, maintaining that position from December 20, 2000 to January 31, 2017. (R. 54, 294.)

While attending a July 2, 2016 concert, Plaintiff had an aneurysm (hereafter, the "July 2016 Onset Incident");[2] believing

---

[2]  While there are slight discrepancies in the record regarding Plaintiff's onset date, they do not affect the Court's ultimate ruling.

it to be a headache, she asked someone to drive her home. (R. 55.) However, while heading to her house, Plaintiff had to call the fire department to take her to Huntington Hospital.  She was later transported to North Shore University. (Id.)

At her January 17, 2019 hearing, Plaintiff was 61 years old. (R. 54.)  At that time, Plaintiff testified: it is hard for her to concentrate; she is very emotional; her thought patterns are all over the place; and, she is having difficulty with short-term memory. (R. 57.)  She further testified she has difficulties with driving and, for example, changing the radio station while driving; yet, she is able to drive herself to the doctors, an approximate 15-mile distance. (R. 59.)

In response to the ALJ's inquiries about physical limitations, Plaintiff testified she can sit for no more than 15-to-20 minutes at any one time and can stand only for a short period of time (R. 60.)  When asked about her trouble walking, Plaintiff explained that "when walking from the parking lot to here I had to stop three times to the door." (R. 61.)  Plaintiff further testified she has trouble lifting things because of spinal stenosis on her left side, but that her right side is "good". (R. 61.) Plaintiff stated her daughter comes over almost every day to help her with most household chores. (R. 63.)

When asked about her left hip, Plaintiff testified that post-aneurysm she went on a cruise, but because her hip pain was

4

so bad, it ruined the entire cruise. (R. 70.)  Plaintiff further
told the ALJ that she cried throughout the entire cruise. (Id.)

    B.   <u>Medical Evidence</u>

        Prior to her alleged disability, the record indicates
Plaintiff had: high blood pressure since 1975; a myocardial
infarction in 1998, which requires three stents; diabetes since
2016; and high cholesterol. (R. 352.)  Plaintiff also had drug-
induced acute pancreatitis, and urinary tract infections
associated with catheterization. (R. 341.)

        On July 2, 2016, the Plaintiff visited the emergency
room complaining of "the worst headache of her life" along with
nausea and experienced vomiting. (R. 327.)  A head CT-scan without
contrast revealed a subarachnoid hemorrhage from posterior
communicating artery. (R. 331-332.)  At that time, the physician
noted Plaintiff was critically ill with a high probability of
imminent or life-threatening deterioration. (R. At 332).
Plaintiff was subsequently discharged on July 19, 2016, at which
time she was in stable condition. (R. 612.)

        On July 26, 2016, the Plaintiff went to Dr. Robert Linden
for an initial visit; she complained of headaches and dizziness.
(R. 341.)  Dr. Linden's notes indicate Plaintiff was alert and
orientated with no apparent distress. (R. 342.)  Plaintiff visited
Dr. Linden, who became her primary care physician, approximately
seven times. (R. 376-406.)  Dr. Linden sent Plaintiff to Dr. Setton

regarding a stent to her cerebral aneurysm. (R. 343.)  On November 10, 2016, the Plaintiff was admitted for an elective angiogram for the stent, i.e., the coiling of her basilar tip aneurysm; she was discharged five days later, on November 15, 2016. (R. 853.)

On February 08, 2017, Dr. Andrea Pollack performed a consultative internal medicine examination of Plaintiff (R. 352); it did not create a doctor-patient relationship (R. 355).  During said examination, Plaintiff reported her aneurysm caused her to suffer: impairment of perception; confusion; dizziness; and occasional headaches. (R. 352.)  Additionally, Plaintiff, who is right-hand dominate, reported imbalance and right-side weakness as a result of the aneurysm. (Id.)

After her exam of Plaintiff, Dr. Pollack made several observations.  For example, Plaintiff conveyed to the Doctor that she engaged in the following daily living activities: cooking; cleaning; shopping; showering; dressing; watching television; listening to the radio; and, reading. (Id.)  The Doctor further reported Plaintiff showed evidence of memory impairment on exam; therefore, she recommended Plaintiff avoid heights, operating heavy machinery, and activities requiring heavy exertion. (R. 355).  Dr. Pollack also reported Plaintiff's: grip strength was 5/5 bilaterally, with hand and finger dexterity intact (id.); strength in her right upper extremity was rated 4/5 (id.); gait showed a slight limp; ability to squat down was 2/3 of the way;

6

and, not requiring help getting on or off the exam table (id.).
Dr. Pollack diagnosed Plaintiff with: hypertension; history of
myocardial infarction; coronary artery disease; diabetes;
hyperlipidemia; and history of a ruptured aneurysm and a stroke.

On March 23, 2017, Dr. Rosanne Pachilakis performed an
eight-hour neuropsychological evaluation of Plaintiff. (R. 359.)
During the evaluation, Plaintiff reported: difficulties with
concentration, especially while driving; difficulty with
multitasking; crying all the time; dizziness; and right-side
residual weakness. (Id.) Summarizing Plaintiff's cognitive
profile, Dr. Pachilakis described it as largely intact and
functioning across multiple cognitive domains, with the exceptions
that Plaintiff had slow processing speed and weak fine-motor and
dexterity skills.[3] (R. 361.)  Dr. Pachilakis recommended
psychotherapy for mood and anxiety symptoms, which were mostly
associated with Plaintiff's adjustment to the change in her
employment status and lifestyle changes following her aneurysm.

---

[3]   For example, Dr. Pachilakis found Plaintiff's: estimated
premorbid functioning based on single word reading and demographic
factors was average (R. 360); performance on a screening measure
of global cognitive function fell well-above the cutoff score used
in determining impairment (id.); immediate auditory attention span
was average and complex attention span was high-average (id.);
working memory index score was at the lower end of the high-average
range (id.); cognitive processing speed was below average and rapid
processing of verbal and nonverbal information was low-average
(id.); and, free recall after a 20-minute delay was low-average
but improves to within average range with categorical cueing. (Id.)

(Id.)  Dr. Pachilakis also noted Plaintiff was within the typical window of recovery for brain injuries. (Id.)

On June 15, 2017, Plaintiff saw Dr. Ralph Mastrangelo, an adult joint reconstructive orthopedic surgeon, for a checkup; she complained of extreme stress causing frequent panic attacks. (R. 381.)  In his notes, the Doctor reported Plaintiff as being obese with a BMI of 33. (R. 383.)

On September 27, 2017, Plaintiff visited Dr. Jonathan Danoff, an orthopedic surgeon, for an evaluation. (R 384.)  Dr. Danoff reported Plaintiff was experiencing left hip and groin pain, that was severe in intensity, and which moderately limited activities of daily living. (Id.)  An x-ray showed: degenerative joint disease of the hip with joint space narrowing; osteophyte formation; and subchondral sclerosis. (Id.)  Dr. Dandoff diagnosed this as left hip arthritis and determined Plaintiff was not an appropriate candidate for surgery. Therefore, he recommended physical therapy and prescribed pain medication. (Id.)

After Plaintiff reported radiating neck pain she experienced for several months, a multiplanar non-contrast MRI of the cervical spine was performed on November 21, 2017. (R. 367.) The MRI showed mild reversal of cervical lordosis, with prominent edematous endplate changes being noted in the C5-C6, C6-C7, and C7-T1 vertebra. (Id.)  Further, arthrosis was found in seven vertebrae, i.e., C1-C2 through C7-1. (R. 367-368.)

8

Upon Dr. Linden's referral, on December 21, 2017, Plaintiff saw Dr. Donna Marchant for a coronary artery disease consultation. (R. 1142.) Dr. Marchant diagnosed Plaintiff with: coronary artery disease; diabetes mellitus type II; dyslipidemia; essential hypertension; dyspnea on exertion; and aortic stenosis. (R. 1143.) She recommended Plaintiff have an echo and nuclear stress test for further evaluation. (R. 1141.)

Dr. John Makaryus performed the recommended stress test upon Plaintiff on January 18, 2018, which showed the left ventricle was normal. (R. 1119.) However, Plaintiff had medium-mild to moderate defects in the distal anterior, the distal anterolateral, and her anteroapical walls, which is suggestive of infract with mild peri-infarct ischemia. (Id.) Plaintiff also had a mild to moderate defect in her inferolateral wall that was partially reversable suggestive of infract with mild to moderate peri-infarct ischemia. (Id.)

The Plaintiff continued following up with Dr. Marchant every four to six weeks. (R. 65.) On January 25, 2018, Plaintiff reported to Dr. Marchant her conviction that she (Plaintiff) was going to die. (R. 1135.) Dr. Marchant noted Plaintiff was very tearful and anxious. (R. 1136.) Plaintiff's physical exam from that date showed her heartrate and rhythm were normal, with a grade 2/6 systolic murmur being heard. (R. 1137.) In summary, Dr. Marchant noted Plaintiff's: palpitations improved; ECG was

unchanged; ECHO was normal: and perfusion imaging showed mild-to-moderate inferolateral and anteroapical ischemia. (R. 1138.) During her April 24, 2018 follow-up visit with Dr. Marchant, Plaintiff informed the Doctor about her upcoming cruise. (R. 1107.)

On April 15, 2018, Plaintiff went to Winthrop Gastroenterology where she was diagnosed with "serrated adenoma of colon". (R. 1045.) Therefore, on August 21, 2018, Plaintiff returned to Dr. Marchant for clearance regarding an upcoming endoscopic mucosal resection of a colon polyp. (R. 1144.) Plaintiff was described as optimized for surgery. (R. 1146.) The resection was performed on September 6 ,2018. (R. 503.)

On November 20, 2018, Plaintiff had a pulmonary test, which revealed lungs with an estimated age of 92 years. (R. 420.) Her chest X-rays showed both linear scarring versus subsegmental atelectasis within the right middle lobe and left lower lobe, and peribranchial thickening within the right lower lobe. (R. 422.)

During a March 15, 2019 routine visit with Dr. Marchant, Plaintiff was found to be in atrial fibrillation; thereafter, she was transferred to North Shore University hospital. (R. 1202.) At the hospital, Plaintiff reported intermittent exertional dyspnea brought on by stair climbing or heavy lifting. (Id.) Thus, she was referred for a cardioversion. (R. 1205.)

C.   <u>Treatments</u>

On July 3, 2016, Plaintiff had a selective cerebral angiography and endovascular obliteration of aneurysm performed by Dr. Setton. (R. 1083).  On July 5, 2016, as a second state approach, Plaintiff visited Dr. Setton again for a stent placement to her cerebral aneurysm. (R. 1069.)

Complaining of neck and middle back pain, Plaintiff went to Carefree Chiropractic on October 4, 2017. (R. 375)  There she filled out a questionnaire stating: her pain was rapidly worsening; she was unable to walk more than one mile without increasing pain; she could not stand or walk for more than one hour without increasing pain; and, as for sitting, she could do so for as long as she liked only if said sitting was in her favorite chair. (<u>Id.</u>)

Almost eight weeks later, on November 25, 2017, Plaintiff returned to Carefree Chiropractic, again complaining of neck and middle back pain. (R. 370.)  At that time, Plaintiff filled out a Neck Disability Index Questionnaire, stating: she could concentrate fully with no difficulty; her pain was moderate and consistent; she suffered slight headaches which occurred infrequently; she was able to lift very light weights; and, her sleep was greatly disturbed. (R. 375.)

On March 20, 2018, Dr. Linden referred Plaintiff to physical therapy due to chronic neck pain and cervical radiculopathy. (R. 1455.)  Plaintiff first visited Summit Physical

11

Therapy P.C. on April 2,2018. (R. 1456.)  She was treated by Dr. Chetan who diagnosed her with Spinal Stenosis. (R. 1465.) Plaintiff went approximately six times for physical therapy. (R. 1465-1475.)  At her last treatment on April 30, 2018, Plaintiff reported her shoulders were feeling significantly improved but, between her shoulder blades, her left side remained painful and tight. (R. 1565.)  Plaintiff was discharged on July 4 ,2018, due to "lost contact". (R. 1453.)

On August 6, 2018, Plaintiff began treatment with Christopher Miranda, a practitioner at NY-Chi Studios Acupuncture and Massage. (R. 527.)  Her treatment plan consisted of acupuncture with electric simulation and massage therapy. (Id.) Plaintiff's appointments continued throughout the rest of the year, with her last treatment of record being on January 6 ,2019. (R. 603.)

On November 12 ,2018, Plaintiff sought treatment from the NorthShore Allergy and Asthma Institute. (R. 407.)  Plaintiff complained of four-and-half-weeks of coughing and reported she went to urgent care. (Id.)  In the office, Plaintiff received a nebulized treatment and was prescribed a nebulizer. (R. 410.) Notes from Plaintiff's subsequent November 20, 2018 visit indicate Plaintiff did not pick up the prescribed medication but, instead, kept a "Pro-Air" on her, which she had not needed to use. (R. 413.)

D.   <u>Opinion Evidence</u>

On January 4, 2019, Dr. Liden completed an assessment regarding Plaintiff's ability to perform work-related activities. (R. 511.)  In the assessment, the Doctor stated his specialty was internal medicine. (<u>Id.</u>)  He also diagnosed Plaintiff with a cognitive impairment due to intracranial hemorrhage and spinal stenosis. (R. 510).  Dr. Liden's assessment also indicated Plaintiff's impairment affected her abilities to lift and carry, <u>e.g.,</u> she could only occasionally lift zero-to-five pounds. Additionally, Plaintiff's standing and walking was affected by her impairment, such that, in an eight-hour day, Plaintiff can stand for only one hour with interruptions. (<u>Id.</u>)  Likewise, Plaintiff's sitting was also affected by her impairments, with Dr. Liden noting Plaintiff could sit in an eight-hour workday only for one hour with interruptions. (<u>Id.</u>)

On January 7, 2019, Dr. Marchant filled out the same assessment form regarding Plaintiff. (R. 512). In that form, Dr. Marchant states her specialty was cardiology. (R. 513.)  Dr. Marchant diagnosed Plaintiff with hyperlipemia, hypertension, aortic stenosis, coronary artery disease, and SIP coronary stent. (<u>Id.</u>)  However, the Doctor did not fill in the assessment form as to Plaintiff's ability to perform activities. (<u>Id.</u>)

Upon the ALJ's request (R. 1162), on February 25, 2019, Neurologist Justin Willer completed a medical interrogatory

13

regarding Plaintiff. (R. 1152-54.)  To complete his interrogatory, Dr. Willer was provided exhibits selected for inclusion in the record of this case (R. 1162); he did not personally examine Plaintiff. (R. 1152.)  Relying upon his review of other medical providers' reports and evaluations, Dr. Willer concluded Plaintiff's impairments, combined or separately, did not meet any impairment described in the Listing of Impairments. (R. 1153.)  In reaching this conclusion, Doctor Willer indicated he found Dr. Pollack's February 8, 2017 report to be inconsistent since Dr. Pollack had reported Plaintiff had right side weakness and imbalance strength of 4/5 for the right upper extremity but also reported a bilateral 5/5 grip strength; Dr. Willer concluded that was not possible. (Id.)  Dr. Willer also highlighted Dr. Linden's finding regarding Plaintiff's inability to lift more than five pounds, but noted the absence of neurosurgery and neurology consultations and progress notes from the record. (Id.)  Dr. Willer further relied upon Dr. Pachilakis' March 2017 neurophysiological evaluation to support his conclusion, highlighting Plaintiff's cognitive function was otherwise normal besides right hand fine motor speed and dexterity. (Id.)  Additionally, Dr. Willer identified a rehabilitation consultation with a Dr. Chalif[4] wherein Dr. Chalif reported both that Plaintiff had normal strength and

---

[4]  The Court believes Dr. Willer inadvertently referred to Dr. Chetan as Dr. Chalif.

conditioning, but gave the impression of a "gait impairment" although there was no description of Plaintiff's gait in the Doctor's notes. (<u>Id.</u>)  And, the endovascular report reviewed by Dr. Willer indicated Plaintiff had a basilar tip aneurysm which was obliterated using microcatheter and coiling. (<u>Id.</u>)  Upon review of this information, Dr. Willer identified Plaintiff's functional limitations to be the inability to perform tasks requiring fine dexterity due to impaired right-hand dexterity onset and restricts in moderate and heavy lifting due to spinal stenosis.

In conjunction with his interrogatory, Dr. Willer also completed a medical statement regarding Plaintiff's ability to perform work-related activities. (R. 1155-60). According to Dr. Willer, via check-box responses, Plaintiff was able to do the following: frequently lift and carry up to 20 pounds and occasionally lift and carry up to 50 pounds (R. 1156); sit, stand or walk for six continuous hours (<u>id.</u>); during an eight-hour workday, sit stand or walk for a total of six hours (<u>id.</u>); continuously use her left hand for all activities (R. 1157); with her right hand: occasionally perform handling, fingering, and peeling; frequently push and pull; and continuously reach in all directions (<u>id.</u>).  Dr. Willer indicated Plaintiff had no limitations as to: use of her feet; climbing stairs, ramps, ladders or scaffolds; or balancing, stooping, kneeling, crouching or crawling. (R. 1157-58.)  Nor did Dr. Willer find Plaintiff had any

15

environmental limitations.  (R. 1159.)  Dr. Willer also found
Plaintiff's limitations did not hinder any identified life
activities.[5] (Id.)

At the second hearing before the ALJ on August 6, 2019,
Dr. Willer testified as a medical expert. (R. 79.)  He initially
testified he was provided additional records that he reviewed and
that did not change his opinion. (R. 80.)  Dr. Willer proceeded to
testify that, due to Plaintiff's impaired dexterity caused by
moderate spinal stenosis, she would have trouble performing a job
requiring typing.  (R. 80-81.)  He also testified there was no
basis in the record to conclude Plaintiff was limited in her
abilities to sit, stand or walk; in doing so, he rejected reliance
upon Plaintiff's MRI since that test was anatomic and not
physiologic.  (R. 82-83.)  There was no additional reporting of
symptoms of pain upon which Dr. Willer could conclude Plaintiff
was limited as to sitting, standing or walking.  (R. 83.)  As such,
Dr. Willer's opinion differed from Dr. Linden's opinion. (Id.)
His opinion addressed Plaintiff's neurological limitations only.
(R. 83-84.)

---

[5]  The life activities identified in the medical statement form
are:  shopping; travel without a companion; ambulate without
assistance; walk a block at a reasonable pace on rough or uneven
surfaces; use standard public transportation; climb a few steps
with the use of a single handrail; prepare a simple meal and feed
oneself; care for one's own personal hygiene; and sort, handle,
and file paperwork.  (R. 1160.)

Finally, the opinion evidence includes an undated, unsigned assessment, believed to be from Dr. Christopher Miranda. (R. 1481-82;[6] compare Court Transcript Index, ECF No. 9 at 5.)   It is based upon the Doctor's examination of Plaintiff.   (R. 1481.) This assessment indicates Plaintiff: can never lift more than five pounds due to atrophy of the upper limbs and arthritis of cervical spine; is able to stand and walk for six hours of an eight-hour workday; but, is unable to sit during an eight-hour workday. (Id.)

E. The VE's Testimony

At the January 17, 2019 hearing, VE Vandergoot testified Plaintiff had worked as a senior court clerk, which would be identified as sedentary. (R. 73.)   The ALJ posed two hypothetical questions to the VE based upon Plaintiff's vocational profile and residual functional capacity ("RFC").   The first hypothetical included both a two-hour limitation in standing or walking and a six-hour limitation in sitting during an eight-hour workday; VE Vandergoot testified such a person could still perform the work of a court clerk.  (R.73-74.)   The second hypothetical posed involved a person subject to a one-hour limitation in standing, walking, and sitting; VE Vandergoot stated such a hypothetical person would be precluded from all employment.  (R. 74.)

---

[6]   Page R. 1482 is a duplicate of page R. 1481.

At the continued August 6, 2019 hearing, VE Dale Pasculli testified. (R. 84-87.) He, too, stated Plaintiff's prior work as a senior court clerk was sedentary. (R. 85.) When asked to consider a hypothetical individual with Plaintiff's vocational profile and RFC, VE Pasculli testified the individual could perform the Plaintiff's past work. (R. 86.) When the ALJ added further limitations, e.g., fine movements of the dominant hand; light exertional limitations; sedentary exertional limitations, VE Pasculli testified such limitations would not affect the hypothetical person's ability to perform the past work. (R. 86-87.) However, if sitting, standing, and walking were limited to only one hour per eight-hour workday, VE Pasculli stated such limitation would preclude all employment for the hypothetical person. (R. 87.) The same would be true if the hypothetical person was also limited by never being able to reach and being only occasionally able to handle, i.e., such limitations would preclude employment for that hypothetical person. (Id.)

DISCUSSION

I.   Standard of Review

A district court has jurisdiction to review the final judgment of the Commissioner denying an application for Social Security benefits. 42 U.S.C § 405(g). The review is limited to two questions: whether substantial evidence supports the Commissioner's decision, and whether the Commissioner applied the

18

correct legal standards. See Boffa v. Kijakazi, No. 20-CV-2632(EK), 2023 WL 4545187, at *5 (E.D.N.Y. July 15, 2023) (quoting Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009)). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (quoting Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)); see also Rucker v. Kijakazi, 48 F.4th 86, 90-91 (2d Cir. 2022) (same). If supported by substantial evidence, the Commissioner's factual findings shall be conclusive. See 42 U.S.C § 405(g). "The substantial evidence standard means once an ALJ finds facts, [courts] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Hart v. Comm'r of Soc. Sec., No. 21-CV-3104, 2023 WL 2873247, at *2 (S.D.N.Y. Feb. 16, 2023) (emphasis in original) (quoting Schillo v. Kijakazi, 31 F.4th 64, 74 (2d Cir. 2022)), report and recommendation adopted, 2023 WL 2424129 (S.D.N.Y. Mar. 9, 2023).

II.  The ALJ's Decision

    A.  The Five-Step Disability Analysis

        In determining if an individual is disabled, an ALJ must follow a five-step, sequential evaluation process. See 20 C.F.R. § 416.920. The Court assumes the parties' knowledge of this well-known process, see, e.g., Hart, 2023 WL 2873247, at *3

19

(articulating five-step process Social Security "Commissioner must follow in determining whether a particular claimant is disabled"), and proceeds to review the ALJ's analysis of same.

B.    The ALJ's Decision

Initially, the ALJ found Plaintiff met the insured status requirements of her claims. (R. 15.)  Next, the ALJ applied the required five-step disability analysis.  In doing so, the ALJ concluded Plaintiff was not disabled from July 1, 2016, through August 20, 2019, the decision date. (R. 22-23).

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since the alleged onset. (R. 15.)  At step two, the ALJ determined Plaintiff had several impairments, i.e., status post subarachnoid hemorrhage; coronary artery disease; and cervical spine degenerative disc disease. (R. 16.)  The ALJ reported this significantly limited the ability to perform basic work activities. (R. 16.)  The ALJ listed several non-severe impairments, i.e.: left hip arthritis; diabetes; hyperlipidemia; hypertension; and, obesity.  He also found Plaintiff's mental health caused non-to-mild impairments since Plaintiff had not alleged these impairments, and the record did not evidence any treatment with mental health professionals. (Id.)  At step three, the ALJ determined Plaintiff's combination of impairments did not meet or equal the severity of one of the listed impairments in the Code of Federal Regulations.  (Id. (20 C.F.R. §§ 404.1520(d),

20

404.1525, and 404.1526).)  Therefore, the ALJ was required to determine Plaintiff's Residual Functional Capacity ("RFC").[7] (R. 17.)

In making his RFC determination, the ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effect of her symptoms were not entirely consistent with the medical evidence. (R. 18.)  This determination was based upon the ALJ's review of: Dr. Linden's medical source statement; Dr. Marchant's medical source statement; Dr. Setton's disability

---

[7]

An individual's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (quoting Soc. Sec. Ruling 96–8p, 1996 WL 374184, *2 (1996)).  In making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain, and other limitations which could interfere with work activities on a regular and continuing basis." Pardee v. Astrue, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)). "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." Stanton v. Astrue, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), aff'd, 370 F. App'x 231 (2d Cir. 2010).

Andrew S. v. Comm'r of Soc. Sec., No. 21-CV-6565, 2024 WL 989705, at *4 (W.D.N.Y. Mar. 7, 2024).

paperwork; Dr. Pollack's evaluation; and Dr. Willer's expert testimony and medical interrogatory responses. (R. 20-22.)

At <u>step four</u>, the ALJ found Plaintiff to be capable of performing her past work. (R. 22.)  In making this finding, the ALJ afforded Dr. Setton's July 2016 opinion "some weight" explaining it was relevant at the time the opinion was provided. (R. 20-21.)  The ALJ assigned Dr. Pollack's opinion "good" weight since it was based upon a personal examination of Plaintiff, but then assigned "lesser" weight to Dr. Pollack's findings regarding Plaintiff's marked limitations because the ALJ determined that finding was not consistent with the determined RFC and was too restrictive. (R. 21.)  As to Plaintiff's treating primary care physician, Dr. Linden, the ALJ assigned "good" weight to Dr. Linden's opinion to the extent it was consistent with the ALJ's determined decided RFC, and "lesser" weight to the Doctor's limitations regarding sitting, standing, walking, and reaching, stating said limitations lacked objective support from the entirety of the record. (<u>Id.</u>)  Dr. Merchant's medical source statement was given no weight by the ALJ because the Doctor did not comment on work-related limitations. (<u>Id.</u>)  Finally, Dr. Willer's opinion was afforded "good" weight by the ALJ since Dr. Willer "thoroughly reviewed the entire record and his opinion is supported by and consistent with the medical evidence of record." (R. 22.)  Upon those purportedly weighted considerations, the ALJ

found Plaintiff was able to: (1) lift up to 10 pounds occasionally; (2) stand and walk for two hours per eight-hour-workday; and (3) sit for six hours per eight-hour-workday with normal breaks.

Thus, the ALJ did not proceed to the fifth step "to consider [Plaintiff's] RFC, age, education, and work experience to determine whether . . . she c[ould] make an adjustment to other work." Hart, 2023 WL 2873247, at *3 (stating "[i]f it is found that the claimant cannot perform his or her past relevant work, the Commissioner proceeds to step five"). Instead, the ALJ found Plaintiff was able to perform the functions of a court clerk notwithstanding her RFC. (R. 22.)

## II. Analysis[8]

### A. The Parties' Positions

On appeal, Plaintiff contends the RFC determination was not supported with substantial evidence since the ALJ failed to properly evaluate Plaintiff's allegations of pain and cognitive difficulties. (Support Memo at 7-9.) Plaintiff further argues the ALJ failed to provide good reasons for discounting Plaintiff's pain allegations and mischaracterized evidence. (Id. at 9-11.)

---

[8] In her Reply, Plaintiff also contends "[b]ecause of [her] age, any decision regarding the addition of mental or non-exertional limitations into the RFC is critical because the addition of any such limitation would preclude past work and direct a finding of disability." (Reply, ECF No. 16, at 2 (citing 20 C.F.R Appendix 2 to Subpart P of Part 404 § 201.06).) This issue may be argued upon remand.

Moreover, Plaintiff maintains the ALJ did not explain how performance of daily living activities translates to performing basic work abilities. (Id. at 11.)  Finally, Plaintiff asserts the ALJ failed to pose a hypothetical question to the VE encompassing all of Plaintiff's limitations, including those due to pain or cognitive deficits.  (Id. at 12-13.)  Plaintiff did not raise specific arguments based upon the treating physician's rule. (See id., in toto.)

Unsurprisingly, in opposition, the Commissioner argues the ALJ's decision was supported by substantial evidence and free of legal error.  More particularly, she contends the ALJ made his RFC finding based upon the entire record, including objective medical evidence, Plaintiff's "mostly routine treatments" addressing her aneurysm, and Plaintiff's daily living activities. (Opp'n at 15-16; see also id. at 16-18 (re: medical evidence); id. at 18-19 (re: daily living activities); id. at 19-20 (re: consideration of the record as a whole).)  The Commissioner would have the Court reject Plaintiff's position that the ALJ's RFC finding was wrong since, while the record as a whole warrants some limitations, it does not support the disabling limitations Plaintiff claims.  (See id. at 21-22.)

B.   The Court's Analysis

At the outset, the Court notes its agreement with Plaintiff that the Commissioner has impermissibly relied upon post

hoc rationalization of the record evidence in objecting to Plaintiff's contentions that the ALJ failed to consider numerous factors when discounting Plaintiff's subjective complaints of pain. (See Reply at 1-2; see also Support Memo at 7 (arguing, "in formulating his RFC, the ALJ failed to account for Plaintiff's allegations of pain").)  Moreover, as Plaintiff aptly argues, "not only did the ALJ fail to provide good reasons for discounting Plaintiff's pain allegations, the evidence he uses to discount her allegations was mischaracterized in order to paint a picture that support[ed] his decision." (Support Memo at 10.)  Again, the Court concurs.

"When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account . . . but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (first citing 20 C.F.R. § 416.929; and McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704–05 (2d Cir. 1980); and then citing Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979)).  Social Security regulations outline a two-step process for evaluating symptoms such as pain.  See 20 C.F.R. § 416.929.  First, the ALJ must determine whether a claimant/plaintiff suffers from a medically determinable

impairment that could reasonably be expected to produce the symptoms alleged. <u>Genier</u>, 606 F.3d at 49 (citing 20 C.F.R. § 416.929(b)). To do so, the ALJ is required to consider the claimant/plaintiff's allegations alongside the available medical evidence. <u>See</u> <u>Cichocki v. Astrue</u>, 534 F. App'x 71, 75-76 (2d Cir. 2013). But while "[o]bjective medical evidence is useful," the ALJ "will not reject statements about the intensity and persistence of pain and other symptoms 'solely because the available objective medical evidence does not substantiate [claimant/plaintiff's] statements.'" <u>Id.</u> at 76 (quoting 20 C.F.R. § 416.929(c)(2)). Rather, at step two, if a claimant/plaintiff's testimony regarding his symptoms is not substantiated by the objective medical evidence, the ALJ must consider "other evidence" in the record, such as:

(i)     Plaintiff's daily activities;
(ii)    The location, duration, frequency, and intensity of plaintiff's pain or other symptoms;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication plaintiff takes or has taken to alleviate his pain or other symptoms;
(v)     Treatment, other than medication, plaintiff receives or has received for relief of his pain or other symptoms;
(vi)    Any measures plaintiff uses or has used to relieve pain or other symptoms; and
(vii)   Other factors concerning plaintiff's functional limitations and restrictions due to pain or other symptoms.

26

Id. (quoting 20 C.F.R. § 416.929(c)(3)).  The ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, <u>and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the individual's statements and the reasons for that weight</u>."  SSR 96-7p, 1996 WL 374186, at *2 (emphasis added).  Nevertheless, "remand is not required where 'the evidence of record permits us to glean the rationale of an ALJ's decision.'"  <u>Cichocki</u>, 534 F. App'x at 76 (quoting <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1040 (2d Cir. 1983)).

Here, review of the record shows the ALJ failed to provide good reasons for discounting Plaintiff's pain allegations and failed to provide supportable rationales for his decision.  Indeed, his decision is not consistent with the record as a whole.  First, he mischaracterized evidence.  And, second, his assignment of weight to the opinions and reports of the various medical personnel is, at times, perplexing when considering the nature of those various opinions and reports.

### 1.   Mischaracterization of Evidence

Plaintiff is correct that the ALJ's description of record evidence, upon which he relied in finding Plaintiff was not disabled, was not always accurate.  By way of example, <u>as to sitting</u>:  Relying upon Plaintiff's December 2, 2016 Function Report (R. 271-278), the ALJ contends Plaintiff reported no difficulties

with sitting.   True, but the ALJ failed to consider that report was only months after the July 2016 Onset Incident.   Yet, thereafter, in early October 2017, Plaintiff reported difficulties with sitting, i.e., that she could sit only for a one-hour period if she were sitting in her favorite chair.  (See R. 375.)  Further, in Dr. Linden's January 2019 assessment of Plaintiff, the Doctor indicated Plaintiff's ability to sit is affected by her impairment and, during an eight-hour workday, Plaintiff could sit at most for one hour, with interruptions.  (R. 510.)  Moreover, at her January 2019 disability hearing, Plaintiff testified that, due to problems in her back, she has trouble sitting and cannot sit for longer than 15-to-20 minutes at a time.  (R. 60.)   Thus, isolating one, early statement of Plaintiff's regarding her ability to sit, the ALJ ignored subsequent relevant other ones.   Further, this was done in the context of evaluating Plaintiff's daily living activities as a basis for concluding "while the [Plaintiff] has impairments that more than minimally impact her ability to engage in work related activities, the degree of impairment does not render her disabled."  (R. 20 (emphasis added).)   Yet, the two settings are not necessarily interchangeable.  See, e.g., Bradley v. Colvin, 110 F. Supp. 3d 429, 446 (E.D.N.Y. 2015) (stating "a claimant's ability to tend to his personal needs and travel to appointments is not indicative of his ability to perform light work" (cleaned up)).

As to walking:  In her December 2, 2016 Function Report
(R. 271-278), while Plaintiff initially indicated walking was not
an issue, she also stated: she was able to walk only a
block-and-a-half before her body starts drooping to the left; she
has difficulty breathing; and she must rest for 15 minutes before
continuing to walk.  (Id. at 277-278.)  Then, in October 2017,
Plaintiff reported she could not walk for more than one mile
without increasing pain.  (R. 375.)  At that time, Plaintiff also
stated her pain was rapidly worsening.  (See id.; see also R.
384-386 (Dr. Danoff's notes of exam of Plaintiff; concluding
arthritis of left hip; hip pain described as severe and "moderately
limits activities of daily living" with "[w]alking tolerance
[being] reduced").)  And, as with her ability to sit, in his
January 2019 assessment of Plaintiff, Doctor Linden indicated
Plaintiff's ability to walk is affected by her impairment, limiting
her to one hour of standing, with interruptions.  (R. 510.)
Further, at her January 2019 disability hearing, Plaintiff
testified that, depending upon the surface, she could have
difficulty walking and that she gets winded when walking, although
she attributed that to issues with her heart.  (R. 60-61.)  Yet,
once more, based upon an earlier, single statement of Plaintiff
regarding her ability to walk, the ALJ ignored relevant other ones
made after Plaintiff's December 2016 statement.  And, again, this
was done in the context of evaluating Plaintiff's daily living

activities as a basis for concluding "while the [Plaintiff] has impairments that more than minimally impact her ability to engage in work related activities, the degree of impairment does not render her disabled." (R. 20 (emphasis added).) However, this Court has recognized that a claimant's "ability to engage in certain daily activities on a limited basis is not inconsistent with the limitations" prescribed by a treating physician in the physician's opinions. Mortellaro, 2022 WL 900595, at *12.

As to standing: Since December 2016, Plaintiff has indicated having difficulty standing for long periods. (R. 276; see also R. 375 (asserting the inability to stand "for longer than 1 hour without increasing pain").) Indeed, when questioned at the January 2019 disability hearing about her ability to stand, Plaintiff testified she had difficulty standing for even short periods of time; by way of example, she stated she "ha[d] a hard time standing at the sink even doing dishes." (R. 60.) Likewise, in January 2019, Doctor Linden indicated Plaintiff could not stand for more than a one-hour period, with interruptions. (R. 510.) Yet, non-examining medical expert Dr. Willer indicated Plaintiff could stand for at least six hours in an eight-hour workday. (R. 1156.) The ALJ determined Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 18.) He concluded "[t]hese

limitations lack objective support from the entirety of the record and are inconsistent with the findings by the consultative examiner [i.e., Dr. Pollack,] and Dr. Linden's own treatment notes as discussed above." (R. 21; see also R. 20-22.) Notably missing from the ALJs lesser weight assigned to Dr. Linden's limitations is any meaningful discussion of the Burgess factors. (See infra.)

As to daily activities: In December 2016, Plaintiff self-reported: needing help with daily activities such as housecleaning and yard work (R. 273); her daughter and son-in-law providing Plaintiff with help as to those chores (R. 274); being able to prepare simple meals (R. 273); being able to drive (R. 274); and, shopping in a hybrid manner, i.e., in stores, on-line, and by phone (see id.). However, approximately two years later, at her January 2019 disability hearing, Plaintiff testified: she drives distances of no more than 15 miles and only during the day (R. 59); she sometimes needs assistance putting on her shoes or coat (R.61-62); she needs daily assistance with household chores such as laundry (R.63-64) and going grocery shopping (R. 64); and, she stops often while walking, such as during grocery shopping (id.).

Regarding Plaintiff's 2018 cruise, Plaintiff testified, inter alia: the pain in her left hip was so debilitating that it ruined her entire trip; she cried throughout the cruise; and, instead of participating in cruise excursions, she remained on the

ship, in her cabin.  (R. 70.)  The ALJ took that trip into consideration when he was considering Plaintiff's abilities to engage in daily living activities, but, his assessment of same was in sharp contrast to Plaintiff's testimony, with the ALJ's clear implication being that if Plaintiff could go cruising, she was also able to resume her sedentary work.  (R. 20.)  However, the ALJ failed to explain why his assessment of Plaintiff's pain experienced during the cruise was in discord with Plaintiff's testimony, i.e., he did not articulate why he discounted Plaintiff's allegations of pain.

In the Social Security disability context, it is well-settled that the ability to engage in daily living activities, which may be considered in assessing a claimant's subjective complaints of pain, see, e.g., Christina J. v. Comm'r of Soc. Sec., No. 21-CV-0317, -- F. Supp. 3d --, 2023 WL 6282924, at *5 (W.D.N.Y. Sept. 27, 2023), does not necessarily translate into being able to engage in work-related activities.  See, e.g., McLean v. Comm'r of Soc. Sec., No. 19-CV-6068, 2023 WL 8021473, at *11 (E.D.N.Y. Nov. 20, 2023) (rejecting ALJ's reliance on claimant's "participation in various group therapies, helping others, being able to travel, handling her father's affairs, and applying for various benefits as evidence of . . . significantly improved symptoms" and retained "capacity for regular work" because "such activities 'ha[ve] little relevance to [claimant's] ability to function in a work

32

setting where [s]he would need to interact appropriately with co-workers and take instructions from authority figures'" (quoting Ferraro v. Saul, 806 F. App'x 13, 16 (2d Cir. 2002)); see also Bradley, 110 F. Supp. 3d at 445-46.   Here, "the ALJ's characterization of [Plaintiff's] reported daily activities is flawed," especially given Plaintiff's testimony which "describes significant limitations on these activities," as well as explained that her cruise was ruined by the pain she suffered and restricted her to staying in her cabin.   Mortellaro, 2022 WL 900595, at *12-13.

### 2.   Assignment of Weight to Opinions and Reports[9]

Under the treating physician rule, the medical opinions and reports of a claimant's treating physicians are to be given "special evidentiary weight."   Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); see also Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) ("[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case

---

[9]   The "Treating Physicians Rule" applies to all claims filed before March 27, 2017.   See 20 C.F.R. § 404.1520c.   Because Plaintiff commenced this action on November 9, 2016, the Treating Physicians Rule applies here. (See Opp'n at 19 n.6 (tacitly acknowledging application of the Treating Physicians Rule in this action)).

record'" (internal alterations and citations omitted; emphasis added)); Richards v. Comm'r of Soc. Sec., No. 23-0486, 2024 WL 1673279, at *2 (2d Cir. Apr. 18, 2024) (summary order) (same). The regulation states:

> Generally, we give more weight to medical opinions from your treating sources . . . . [I]f we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2). Again, however, the opinion of a treating physician need not be given controlling weight where "the treating physician issued opinions that are not consistent with other substantial evidence in the record." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citing Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002)) (emphasis added); 20 C.F.R. § 404.1527(d)(2).

If the ALJ does not give the treating physician's opinion controlling weight, "[he] must determine how much weight, if any, to give it" by "explicitly consider[ing] the following, nonexclusive Burgess factors: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is

a specialist." Estrella v. Berryhill, 925 F.3d 90, 95-96 (2d Cir. 2019) (internal quotation marks and brackets omitted); see also Burgess, 537 F.3d at 129.   The ALJ must also set forth "'good reasons' for not crediting the opinion of a [plaintiff's] treating physician." Schnetzler v. Astrue, 533 F. Supp. 2d 272, 287 (E.D.N.Y. 2008); see Estrella, 925 F.3d at 96.   An ALJ provides "'good reasons' for discounting a treating physician's opinion that reflect in substance the [Burgess factors] . . ., even though the ALJ declines to examine the factors with explicit reference." Cromwell v. Comm'r of Soc. Sec., 705 F. App'x 34, 35 (2d Cir. 2017).

An ALJ's failure to explicitly apply these factors when assigning weight to a treating physician's opinion is a procedural error; however, where "'a searching review of the record' assures [the court] 'that the substance of the treating physician rule was not traversed,'" the Court will affirm.  Estrella, 925 F.3d at 96 (quoting Halloran, 362 F.3d at 32); see also Richards, 2024 WL 1673279, at *2.  "If the Commissioner has not otherwise provided good reasons for its weight assessment, we are unable to conclude that the error was harmless and consequently remand for the ALJ to comprehensively set forth its reasons."  Id. (internal quotation marks and brackets omitted); see also Hart, 2023 WL 2873247, at *4 (stating failure to provide good reasons for not crediting the opinion of claimant's treating physician is grounds for remand).

Here, the Court finds the ALJ has violated the treating physician rule by failing to properly explain why he did not assign controlling weight to the opinions and reports of Dr. Linden, Plaintiff's treating physician; that is, by failing to apply the Burgess Factors, the ALJ did not provide good reasons for discounting the opinion of Plaintiff's treating physician, Dr. Linden. As an initial matter, while the ALJ afforded Dr. Linden's opinion "good weight" to the extent it was consistent with the ALJ's RFC finding, the Court is unsure how it is to assess that assignment of weight since the modifier "good" is subjective and nonquantitative.[10] Second, medical evidence, i.e., the opinion of a claimant's treating physician and other medical evidence, is to be used in making an RFC determination, and not the other way around. Yet, it appears the ALJ placed the proverbial horse before the cart, relying upon his RFC finding to determine the amount of weight to assign a medical opinion.[11] However, an ALJ cannot simply

---

[10] Cf., e.g., Hart, 2023 WL 2873247, at *6 (using terms such as "little weight", "significant weight", and "some weight" in assigning weight to medical and non-medical opinion evidence); McLean, 2023 WL 8021473 (employing terms such as "lacking weight", "little weight", "controlling weight" when discussing amount of weight assigned to treating physician). The terms employed in these cases connote a quantity of weight making their use easily assessable. By contrast, in this context, use of a term such as "good" is too vague and subjective for the Court to engage in meaningful review.

[11] Indeed, given that the ALJ failed to articulate his consideration of the Burgess factors in assigning weight to the record medical evidence, the Court is left with the impression the

"pick and choose" evidence in the record that supports his conclusion. Rivera v. Sullivan, 771 F. Supp. 1339, 1354 (S.D.N.Y. 1991).[12]  Third, to the extent the ALJ assigned "lesser" weight to Dr. Linden's limitations regarding Plaintiff's sitting, standing, and walking, he failed to adequately articulate his rationale for this discounting.  Rather, in a cursory manner, the ALJ asserts Dr. Linden's opinion lacks objective support from the record and is inconsistent with Dr. Linden's own treatment notes.  (R. 21.) Such a perfunctory explanation does "not otherwise provided good reasons for [the ALJ's] weight assessment;" thus, the Court is "unable to conclude that the error [in weight assignment] was harmless and consequently remand for the ALJ to comprehensively

---

ALJ cherrypicked the record to choose what supported his RFC determination.  Compare Bradley, 110 F. Supp. 3d at 446 (stating ALJ improperly evaluated claimant's "testimony against a 'light work' RFC, despite clear precedent in the Second Circuit stating that th[e] ALJ must assess the claimant's credibility before making an RFC finding" (citations omitted)).

[12]
> It is not proper for the ALJ to simply pick and choose from the transcript only such evidence as supports his determination, without affording consideration to evidence supporting the plaintiff's claims.  It is grounds for remand for the ALJ to ignore parts of the record that are probative of the plaintiff's disability claim.

Hamedallah v. Astrue, 876 F. Supp. 2d 133, 142 (N.D.N.Y. 2012); see also Pacheco v. Barnhart, No. 03-CV-3235, 2004 2004 WL 1345030, at *4 (E.D.N.Y. June 14, 2004) (stating an ALJ's "failure to acknowledge relevant evidence or explain its implicit rejection is plain error" (citing Sullivan, 771 F. Supp. at 1354)).

set forth [his] reasons" is necessary.  Estrella, 925 F.3d at 96; see also Richards v. Comm'r of Soc. Sec., No. 23-0486, 2024 WL 1673279, at *3 (2d Cir. Apr. 18, 2024) (summary order) (instructing remand of case to Commissioner where ALJ "neither provided a detailed explanation of his decision to give less than controlling weight to [treating physician's] opinion, nor made his reasoning easily understandable for a review of the record" thereby "fail[ing] to comply with the procedural mandates of the treating physician rule" (cleaned up)).

Relatedly, the ALJ's contention that Dr. Linden's opinion is inconsistent with the findings made by the consultative examiner, Dr. Pollack, is unavailing.  Again, the Court observes the ALJ affords Dr. Pollack's opinion non-quantitative "good" weight and then only to the extent it is consistent with his RFC finding.  As with Dr. Linden's opinion, this is troubling for two reasons:  (1) the ALJ's assigned "good" weight is vague and subjective; and (2) the ALJ uses his RFC finding as the basis for the weight he assigned to Dr. Pollack's opinion, and not the other way around.  Cf., e.g., Hilsdorf v. Comm'r of Soc. Sec., 724 F. Supp. 2d 330, 348-49 (E.D.N.Y. 2010) (instructing that, in determining a claimant's RFC, the ALJ's determination must be "based on the evidence available in the case record").  In any event, notwithstanding Dr. Pollack's single February 2017 examination of Plaintiff, made approximately seven months after

38

the Onset Incident, it pales in comparison to Dr. Linden's lengthy doctor-patient relationship with Plaintiff. "Given this [comparatively] lengthy patient-doctor relationship [with Dr. Linden versus Dr. Pollack], the Court cannot be sure the ALJ would have assigned Dr. [Pollack]'s opinions '[good] weight' if []he had explained h[is] consideration of the Burgess factors." McLean, 2023 WL 8021473, at *11; see also Mortellaro v. Comm'r of Soc. Sec., No. 19-CV-4868, 2022 WL 900595, at *12 (E.D.N.Y. Mar. 28, 2022) (where, "[i]n explaining his decision to afford Plaintiff's treating physicians' opinions less than controlling weight, the ALJ generally stated that the opinions were not consistent with the evidence in the record," finding "[t]his constitutes error requiring remand because the ALJ's lack of particularity frustrates the Court's review of the weight afforded to these opinions"); Colon Medina v. Comm'r of Soc. Sec., 351 F. Supp. 3d 295, 3030 (W.D.N.Y. 2018) ("Because the ALJ's reasoning for rejecting several opinions in the record is abundantly unclear to the Court, the matter must be remanded for further proceedings."). Indeed, given that Dr. Pollack was a consulting doctor, her "opinions or report should be given limited weight." Hilsdorf, 724 F. Supp. 2d at 344 (quoting Cruz v. Sullivan, 912 F.2d 8, 18 (2d Cir. 1990)). "This is justified because consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of

39

the claimant on a single day.  Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons." Cruz, 912 F.2d at 13; see also Fintz v. Kijakazi, No. 22-CV-0337, 2023 WL 2974132, at *4-5 (E.D.N.Y. Apr. 15, 2023) (finding deficient ALJ's reliance on single report of consulting physician who examined claimant once, especially since courts frequently caution ALJs against such heavy reliance of same).

Nor does the ALJ's reliance upon the opinion of Dr. Willer assuage the Court's concern regarding the discounting of the opinion of Plaintiff's treating physician, Dr. Linden.

> An ALJ's obligation to obtain necessary medical records includes an obligation to obtain a proper assessment of the claimant's RFC. See 20 C.F.R. § 404.1513(b) (describing "medical reports" as including "statements about what [a claimant] can still do"). Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error. See Woodford v. Apfel, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000) ("An ALJ commits legal error when he makes a residual functional capacity determination based on medical reports that do not specifically explain the scope of claimant's work-related capabilities."); Zorilla v. Chater, 915 F. Supp. 662, 666-67 (S.D.N.Y.1996) ("The lay evaluation of an ALJ is not sufficient evidence of the claimant's work capacity; an explanation of the claimant's functional capacity from a doctor is required.").

Hilsdorf, 724 F. Supp. 2d at 347 (E.D.N.Y. 2010).  In Hilsdorf,
one of the reasons the court found the ALJ's RFC determination to
be legal error was because he based it upon the opinion of a doctor
who "failed to provide any medical evidence or basis for his
conclusions" and who "neither treated nor examined [p]laintiff,"
but "based his opinion on tests and examinations conducted by other
physicians."  Id.  However, "[m]edical reports that are not based
on personal observations 'deserve little weight in the overall
evaluation of disability.'"  Id. (quoting Vargas v. Sullivan, 898
F.2d 293, 295-96 (2d Cir. 1990); further citation omitted).  Yet,
that is what occurred here.

        Dr. Willer did not examine or treat Plaintiff.  His
report, concluding that Plaintiff could, e.g., sit and stand for
six-hour period during an eight-hour workday, was based upon review
of Plaintiff's medical records, including Dr. Linden's notes and
reports.  (See R. 79-80.)  However, it is well-settled that
"[w]ithout the support of an opinion by an expert who actually
examined Plaintiff . . . , the non-examining doctor['s] opinion[]
cannot constitute substantial evidence" supporting an RFC
determination.  Fintz, 2023 WL 2974132, at *6 (citing Avila v.
Comm'r of Soc. Sec. Admin., No. 20-CV-1360, 2021 WL 3774317, at
*20 (S.D.N.Y. Aug. 9, 2021)).  Here, for example, even though Dr.
Willer explained why he did not consider Plaintiff's MRI to be
persuasive regarding her limitations, i.e., "because the MRI is

41

anatomic" (R.82), he further testified that, since he was not an orthopedic expert, he could not testify regarding Plaintiff's diagnosis of osteoarthritis in the hip and resulting orthopedic limitations. (R. 83; see also R. 84 ("I can only address, strictly, the neurological limitations").) Yet, the ALJ failed to reconcile Dr. Willer's contention that "there's nothing really in the record to indicate if [Plaintiff] has any limitations" (R. 81), with his concession that he was not qualified to opine on her orthopedic limitations (see R. 83), which the ALJ should have done especially because he discounted the opinion of Plaintiff's treating physician who found Plaintiff was subject to sitting and standing limitations, presumably resulting from the osteoarthritis in her hip. See, e.g., Fintz, 2023 WL 2974132, at *7 (stating: "the ALJ generally has an affirmative obligation to develop the administrative record"; "[w]hen there is not substantial evidence, the ALJ is required to resolve inconsistencies between medical opinions if those inconsistencies constitute a 'gap' in the record"; and "an ALJ is required to seek additional evidence or clarification from a medical source in the event that the report they submitted is too vague to determine whether Plaintiff is disabled" (citations omitted)).

Likewise, instead of further developing the record, as he was obligated to do, see Fintz, 2023 WL 2974132, at *7, seemingly out-of-hand, the ALJ rejected the unsigned limitations

42

assessment report.  (See R. 1481-82.)  At a minimum, the ALJ should have sought clarification as to who prepared said unsigned report, in which the identified limitations were consistent with those reported by Dr. Linden.  (Compare R. 510-11 (Dr. Linden's Report), with R. 1481-82 (unsigned Report).)  Relatedly, to the extent Dr. Linden indicated in a check-box format that Plaintiff was limited to sitting and standing for no more than one hour during an eight-hour workday without further explanation, the ALJ was obligated to parse out that conclusion, seeking further clarification, especially in the face of Dr. Willer's testimony that he was not competent to comment upon same given the record before him and that he was not an orthopedic expert.  See, e.g., Fintz, 2023 WL 2974132, at *7 ("[A]n ALJ is required to seek additional evidence or clarification from a medical source in the event that the report they submitted is too vague to determine whether Plaintiff is disabled." (citations omitted)).

* * *

       In sum, since the ALJ's reasoning for weighing the medical opinions in the record is abundantly unclear to the Court, and the ALJ did not specifically explain why Plaintiff's statements regarding the pain she endured when sitting, standing and walking were not entirely consistent with the medical evidence and other evidence in the record, see, e.g., Hamilton v. Saul, No. 20-CV-0457, 2021 WL 4407873, at *3 (E.D.N.Y. Sept. 27, 2021)

43

(remanding matter where, <u>inter alia</u>, in weighing testimony, ALJ failed to "explain his reasoning in a way that permits the court to 'glean' the basis for his credibility determination"), this matter must be remanded for further proceedings.[13]

CONCLUSION

Accordingly, for the stated reasons, **IT IS HEREBY ORDERED** that Plaintiff's Motion (ECF No. 12) is granted to the extent the Commissioner's decision is VACATED, and this case is REMANDED for further administrative proceedings, including a <u>de novo</u> hearing;

Correspondingly, **IT IS FURTHER ORDERED** that the Commissioner's Cross-Motion (ECF No. 15) is DENIED; and

**IT IS FURTHER ORDERED** that the Clerk of the Court enter judgment accordingly and, thereafter, mark this case CLOSED.

**SO ORDERED.**

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: June 17, 2024
        Central Islip, New York

---

[13]  Finding Plaintiff has shown procedural error by the ALJ warranting remand, the Court need not address Plaintiff's further arguments regarding the hypothetical questions the ALJ posed to the VEs. Nonetheless, it appears that in the hypotheticals posed, the "ALJ sufficiently accounted for the 'combined effect of [Plaintiff's] impairments." <u>McIntyre v. Colvin</u>, 758 F.3d 146, 151 (2d Cir. 2014).